## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **EDGAR RAY BETTIS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00164** |
| | ) | **Judge Trauger** |
| **SHAWN PHILLIPS, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM

Edgar Ray Bettis is serving a life sentence based on his 2012 conviction by a Dickson County, Tennessee jury of first-degree murder. On February 20, 2019, he filed his pro se petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) The respondent filed an answer to the petition (Doc. No. 11) and the state court record (Doc. No. 10). The petitioner did not file a reply to the respondent's answer.

This matter is ripe for the court's review, and the court has jurisdiction. The respondent does not dispute that the petition is timely, that this is the petitioner's first Section 2254 petition related to this conviction, and that there are no proceedings available in state court to redress any claims of the petition. (Doc. No. 11 at 1–2.) Having reviewed the petitioner's arguments and the underlying record, the court finds that an evidentiary hearing is not required. As explained below, the petitioner is not entitled to relief under Section 2254, and his petition will therefore be denied.

## I. PROCEDURAL HISTORY

In July 2011, a Dickson County grand jury charged the petitioner with the unlawful killing of the victim, Frankie L. Hudson, during the perpetration of a theft (felony murder), first-degree premeditated murder, and felonious theft of property. (Doc. No. 10-1 at 13–14.) The jury convicted

the petitioner of second-degree murder as a lesser-included offense of first-degree felony murder, first-degree premeditated murder, and unauthorized use of an automobile (a misdemeanor also known as "joyriding") as a lesser-included offense of felonious theft of property. (*Id.* at 70–71; Doc. No. 10-6 at 43–44.) The second-degree murder conviction was then merged into the first-degree conviction. (Doc. No. 10-6 at 45.) The petitioner was sentenced to life imprisonment for the murder conviction and a concurrent sentence for the misdemeanor conviction. (*Id.* at 46.)

On direct appeal, the Tennessee Court of Criminal Appeals (TCCA) affirmed the trial court's judgments. *State v. Bettis*, No. M2012-02158-CCA-R3-CD, 2013 WL 5436702 (Tenn. Crim. App. Sept. 27, 2013); (Doc. No. 10-11). The Tennessee Supreme Court denied discretionary review on January 16, 2014. (Doc. No. 10-14.)

The petitioner thereafter timely filed a pro se petition for post-conviction relief, which was amended after counsel was appointed. (Doc. No. 10-15 at 5–56.) At the petitioner's request and with the State's agreement, the post-conviction trial court ordered a forensic evaluation to determine the petitioner's competence (Doc. No. 10-21 at 75–77), after which the matter came before the court for an evidentiary hearing. (Doc. No. 10-22.) The post-conviction trial court denied relief on August 25, 2017. (Doc. No. 10-21 at 79–91.)

On July 9, 2018, the TCCA affirmed the denial of post-conviction relief. *Bettis v. State*, No. M2017-01845-CCA-R3-PC, 2018 WL 3342830 (Tenn. Crim. App. July 9, 2018); (Doc. No. 10-25). The petitioner filed for permission to appeal to the Tennessee Supreme Court, which was denied on November 14, 2018. (Doc. No. 10-29.) The petitioner then filed his pro se petition under Section 2254 in this court.

## II. STATEMENT OF FACTS

A. <u>Trial Proceedings</u>

At trial, Mr. Howell N. Perkins testified that his mother, the victim, was 79 years old at the time of her death. The victim lived in a home next to a trailer park where she worked as the manager, and where the petitioner lived with his brother, Delbert Bettis. *State v. Bettis*, 2013 WL 5436702, at *1, 6. The part-owner of the trailer park, Brenda Bradbury, testified that the victim had been managing the park for about three years, did an excellent job, and was not known by Bradbury to have ever exhibited any aggressive behavior, though she "could be stern and sometimes helped evict tenants." *Id.* at *5. On April 2, 2011, Ron Pew, the petitioner's half-brother who worked closely with the victim as the maintenance manager for the trailer park, discovered her body on the floor of the living room of her home. He testified that he "touched her, discovered she was stiff, and called 911." *Id.* at *6.

After responding to Pew's 911 call, local law enforcement called upon Agent Joe Craig of the Tennessee Bureau of Investigation to assist with the case. Agent Craig testified that he responded to the victim's home on the afternoon of April 2, where he saw the victim lying face-down on her living room floor with blood on her head and upper body. He testified that a blue ashtray was on a coffee table near the victim, and that he noticed "a speck of red, yellow, or pink metallic paint" on the ashtray. *Id.* at *1. "A similar flake of paint was in the victim's hair, and a piece of a number two pencil was on the floor between the victim's arm and head." *Id.* Agent Craig "determined that the paint on the pencil was consistent with the speck of paint on the ashtray," but he "did not see anything on the floor around the victim's body to indicate that a struggle had occurred." *Id.*

3

When Agent Craig learned that the petitioner's brothers had not seen him in recent hours and that the victim's car was missing, an alert was issued to law enforcement to be on the lookout for the victim's car. Agent Craig testified that the following events ensued:

> Agent Craig received information from a cab driver who had picked up the [petitioner] at a Pilot truck stop. The victim's car was at the truck stop. Based on the cab driver's information, Agent Craig sent an officer from the Dickson County Sheriff's Department to the Greyhound bus station in Nashville to determine if the [petitioner] had bought a ticket there. Agent Craig was informed that the bus station possessed video showing the [petitioner] purchasing a ticket to Shreveport, Louisiana, earlier that morning. The bus to Shreveport had left Nashville at 8:00 a.m.

> Agent Craig testified that the victim's purse was in her home and was taken into evidence. A receipt book was on a table, and the victim had written a receipt dated April 1 for $260. However, she had not written a name on the receipt. A green money bag was on a chair at the table, but no money was in the bag. Agent Craig learned that the [petitioner] was living with his brothers [Delbert Bettis and Edward Maples] in a single-wide trailer that was fifteen to twenty yards from the victim's back door, and Agent Craig searched the trailer. In the [petitioner's] bedroom, officers found a gray striped shirt and a pair of dark Dickies pants. Hair consistent with the victim's hair was on the pants, and Walmart receipts for luggage, a six-pack of Ensure, and a bank withdrawal were in a pocket of the pants. According to the receipts, the [petitioner] bought the luggage and Ensure at 11:43 a.m. and withdrew $298 at 12:27 p.m. on April 1. The officers found a pair of latex gloves in the bathroom. Agent Craig identified a receipt from the Comfort Inn in Dickson, showing that the [petitioner] checked in at 8:56 p.m. on April 1 and checked out at 4:43 a.m. on April 2. Agent Craig said he viewed video from the Comfort Inn. In the video, the [petitioner] appeared to be wearing the same gray striped shirt found in his bedroom.

*Id.* at *2.

Edward Maples, the petitioner's brother who had been staying in the trailer with the petitioner and Delbert Bettis since returning from California where he was wanted for a parole violation, gave a statement to police in which he indicated that the petitioner returned home from the Comfort Inn and changed clothes before leaving for Nashville. However, Maples also told police that the petitioner was wearing latex gloves with blood on them, had a white garbage bag with him, and "said he was going to have the mafia kill Maples if Maples testified against him."

*Id.* at *3, 4. Maples also testified at the petitioner's trial, stating that the petitioner had confessed to him "that he killed the victim and that 'she deserved what she got.'" *Id.* at *7. Maples stated that he was facing four years of confinement from a parole violation in California but did not agree to testify against his brother to help his case in California. *Id.* However, "[o]n redirect examination, Maples showed the jury his California 'parole release card,' showing that his parole violation case had been discharged. On recross examination, Maples acknowledged that he had told some lies in this case. He said he lied due to threats he received." *Id.* at *8. The petitioner's brother Delbert testified that "Maples did not tell him that Maples had seen the [petitioner] with bloody gloves or that the [petitioner] had claimed he killed the victim," and that Maples "did not know where the [petitioner] was." *Id.*

In any event, the petitioner was arrested on the evening of April 2 in Jackson, Mississippi, and was interviewed by Agent Craig on April 3, 2011. *Id.* at *2. Agent Craig testified to the results of that interview, as follows:

> The next day [following the petitioner's arrest], Agent Craig interviewed the [petitioner] and wrote out his statement. The [petitioner] signed the statement in which he said the following: On April 1, the [petitioner] went to the victim's house in order to pay his share of the trailer rent, $250. The victim became upset and "began talking about Danny," a man who had rented the [petitioner's] trailer prior to the [petitioner] and his brothers. The victim said Danny owed her $10,000, became very angry, and yelled at the [petitioner]. The [petitioner] told her to calm down, but she kept yelling and shoved him. The [petitioner] grabbed the victim by her hair to stop her, but she "kept coming at" him. The [petitioner] grabbed an ashtray off a table and hit the victim on her head two or three times. He pulled out a stun gun and hit her neck two or three times, but it did not stop her. The victim tried to stab the [petitioner] with a pencil, but the [petitioner] grabbed the victim's hand and broke the pencil. The [petitioner] grabbed the victim's neck and choked her until she stopped fighting. Their altercation lasted about twenty minutes. After the [petitioner] choked the victim, he took her car keys, went to his trailer, took a shower, and changed clothes. He was wearing a gray shirt, Dickies slacks, and loafers. He packed his clothes, put the stun gun in one of his bags, and drove the victim's car to the Comfort Inn. The [petitioner] rented a room and stayed there all night. The next morning, he left the victim's car at a Pilot truck stop, called a cab, and had the cab driver take him to the Greyhound bus station in Nashville. The

5

[petitioner], who had four bags, bought a ticket to Shreveport. When the bus stopped in Jackson, Mississippi, the police arrested him.

*Id.*

Agent Craig further testified that forensic investigation revealed no fingerprints on the blue ashtray or green money bag at the crime scene, but did reveal the presence of the victim's blood on one of the sleeves of the petitioner's gray striped shirt and the petitioner's DNA underneath the fingernails of the victim's right hand. *Id.* at *3. Video evidence from the Dickson Walmart confirmed the petitioner's purchase of four pieces of luggage and Ensure at 11:42 a.m. on April 1, 2011, as well as his withdrawal from Walmart Financial Services about 45 minutes later. *Id.* Video evidence from the Greyhound bus station showed that when the petitioner's cab arrived at the station, he and the cab driver unloaded six bags from the cab's trunk. *Id.* Agent Craig acknowledged that the petitioner had purchased his stun gun years prior to his encounter with the victim, and that "there was no evidence the appellant planned to kill the victim": "[a]lthough the [petitioner's] buying luggage indicated that he planned to leave Dickson, the [petitioner] and his brothers had discussed leaving prior to April 1," he had monthly income of $700 in Social Security disability benefits, and there was no evidence that the petitioner and the victim had had issues in the past. *Id.* at *3. But Agent Craig also "acknowledged that photographs of the crime scene showed two trash cans and that neither can had a trash bag in it," and stated that "the gloves and the garbage bag indicated that the [petitioner] altered the crime scene before the victim's body was discovered." *Id.* at *4.

The cab driver who responded to the petitioner's call for a taxi from the Pilot truck stop to the Greyhound bus station, Michael Adams, testified that the petitioner let him load some of the petitioner's bags into the cab's trunk, but stated as to two of the bags, "let me get these two, I don't want you touching these two." *Id.* "At some point during the drive, traffic backed up. The

6

[petitioner] became nervous and told Adams he was in a hurry. However, the [petitioner] calmed down when he saw that a wreck was causing the backup." *Id.*

Brian Johnson, the Chief of Police in Burns, Tennessee in April 2011, testified that he went with Agent Craig to Jackson, Mississippi to interview the petitioner, and that the petitioner stated that when the victim came at him with the yellow pencil, he "grabbed the victim's neck and squeezed it," that "[d]uring their struggle, the victim tried to pry the [petitioner's] fingers off of her," and that "[t]he petitioner became angry and choked the victim until she stopped breathing." *Id.* Johnson also testified that the petitioner started crying about fifteen minutes into the interview. *Id.*

The State's proof concluded with the following expert testimony:

Adele Lewis, the Deputy Chief Medical Examiner for Davidson County, testified as an expert in forensic pathology that Dr. Thomas Deering performed the victim's autopsy, that Dr. Deering was unavailable to testify, that she had reviewed Dr. Deering's autopsy report, and that she agreed with Dr. Deering's findings.[1] The victim was four feet, eleven inches tall and weighed one hundred eight pounds. She had multiple cuts on the top of her head that appeared to have been caused by her head being struck by a blunt object or her head striking a blunt object. She also had scrapes across her forehead and left eye, multiple abrasions on her left cheek, and bleeding deep under her scalp. The victim's head and face injuries were consistent with her having been hit with an ashtray. Bruises and scrapes on the backs of her hands could have been defensive wounds. The victim had an injury behind her left ear that was possibly a stab wound from a pencil. She also had an injury to the back of her left ear, and it was probably caused by an object or hand hitting her ear. The victim had a puncture wound on the tip of her chin and abrasions on her jaw that

---

[1] On post-conviction appeal, the TCCA recounted the following circumstances surrounding Dr. Lewis's testimony:

The Petitioner's trial counsel entered an agreed order allowing a substitute medical examiner, Dr. Adele Lewis, to testify for Dr. Thomas Deering, the examiner who had actually performed the autopsy. In a jury-out hearing, trial counsel objected to certain autopsy photographs showing the victim's broken and excised larynx. The trial court determined that a photograph would be admitted but would be reproduced in a black-and-white rather than color format. Trial counsel also objected to any testimony from Dr. Lewis which would differ from the written autopsy report, and the trial court ruled that as long as Dr. Lewis "stay[ed] roughly close" to the report, her testimony would be admitted.

*Bettis v. State*, 2018 WL 3342830, at *2.

7

were caused by blunt force trauma such as a fist hitting her face. Dr. Lewis acknowledged that the wounds also could have been caused by the victim's own fingernails as she tried to get the [petitioner's] hands off her neck. The victim did not have any skull fractures.

Dr. Lewis testified that the victim's injuries could have rendered her unconscious but that they were not fatal. She said that Dr. Deering "paid special close attention to the muscles and the soft tissues and the bones of the neck. Specifically, he did a very detailed dissection of these, looking for any injuries." Dr. Deering found a fracture in one of the bones in the victim's larynx and bleeding around the broken bone. The State showed a black and white photograph of the victim's larynx to the jury, and Dr. Lewis said the photograph showed broken thyroid cartilage on the left side. Dr. Lewis explained that a significant amount of force must have been applied to the victim's neck and that such an injury was more frequently seen in strangulation by hand than strangulation by an object such as a rope. The victim also had bite hemorrhages on her tongue, suggesting that she bit her tongue during her struggle with the [petitioner]. Dr. Deering's report stated that the victim's cause of death was "multiple modality trauma," which Dr. Lewis described as a "term that encompasses the fact that this lady not only was . . . beaten or struck with something, but also strangled. Another way to have put it would have been blunt force injuries to the head and strangulation." However, "[t]he actual terminal event was the strangulation." Dr. Lewis said that strangulation for at least thirty seconds caused unconsciousness and that strangulation for two to four minutes caused death.

On cross-examination, Dr. Lewis acknowledged that she did not know if the victim was attacking someone at the time of death and that the wounds on the back of the victim's hands could have been offensive wounds. She also acknowledged that an older person's larynx was easier to break than that of a younger person. The victim could have died from strangulation in one to two minutes.

*Id.* at *9–10. The defense did not put on any proof after the State rested its case.

B. Post-Conviction Review

The following summation of proceedings before the post-conviction trial court is taken from the TCCA's opinion affirming the denial of relief on the petitioner's claims of ineffective assistance of trial counsel (Doc. No. 10-25):

At the post-conviction hearing, Dr. Jon Garrison, a forensic evaluator and expert in psychology, testified regarding the Petitioner's competency. Dr. Garrison confirmed that the Petitioner was on medications for physical ailments. He evaluated the Petitioner and determined that the Petitioner was competent at the time of the post-conviction hearing. He agreed that elderly people such as the

8

Petitioner might have difficulty participating in their own defense due to physical ailments. He could not determine if the Petitioner was competent at the time of trial, explaining that making a retroactive competency determination would not be ethical or possible because competency could vary over time.

The Petitioner testified that he suffered from high blood pressure and a heart condition and that he would experience dizziness and would "lose [his] thoughts" if he failed to take his medication. He "believe[d]" he told trial counsel about his symptoms before trial. However, he did not recall discussing psychiatric issues, mental issues, memory loss, or disorientation with trial counsel. He testified that around 2011, he suffered from confusion and memory loss. Trial counsel never discussed evaluating the Petitioner's competency. The Petitioner was not on the same medication at the time he was arrested and at the time of the post-conviction hearing. He stated that he was currently worse than he was at the time of trial, but he ultimately clarified that he felt worse because his physical health had declined and not because his mental health had changed.

The Petitioner stated he had been awake for three or four days prior to his interview with Agent Craig in Jackson, Mississippi. He felt tired, "woozy," and "[j]ust out of it" during the interview. He was permitted to take his medication at the Mississippi jail. He did not recall telling Agent Craig that he was too tired to participate in the interview or "nodding off" during the interview. He did not ask Agent Craig to stop the interview.

The Petitioner testified that he recalled trial counsel informing him that he did not have to agree to Dr. Lewis substituting for Dr. Deering, but he did not understand that by entering the agreed order, he was waiving his right to challenge her testimony.

Trial counsel testified that he met with the Petitioner numerous times and that he and his office staff interviewed potential witnesses. Trial counsel did not have the Petitioner evaluated for competency because he saw no evidence of dementia or anything else that would cause him to question the Petitioner's competency. The Petitioner "was very helpful all the way through, and he clearly understood everything that was going on." Trial counsel investigated witnesses to try to elicit statements regarding the Petitioner's mental health. Trial counsel stated that he did not anticipate having evidence that the Petitioner was not competent, but that he referenced the Petitioner's mental health in his opening statement to emphasize to the jury that the Petitioner, like the victim, was elderly and might be less accountable for his actions. Trial counsel did not argue to the jury that the Petitioner was incompetent but only that his age-related physical and mental health issues would diminish his culpability. While Mr. Maples testified that the Petitioner had Alzheimer's disease, trial counsel described Mr. Maples's testimony in general as "delusional." For example, Mr. Maples testified that he was afraid he was being targeted by the mafia and that he had a card issued by the State of California which forbade his arrest by any law enforcement officer in any state. Furthermore, the trial

9

court sustained an objection to Mr. Maples's testimony that the Petitioner suffered from Alzheimer's disease.

Trial counsel was not aware that the Petitioner had been awake for several days prior to giving the statement to Agent Craig. He did not file a motion to suppress because he saw no basis to assert that the statement was obtained in violation of the Petitioner's rights.

Trial counsel testified that he made a strategic decision to agree to substitute Dr. Lewis's testimony because he thought it was likely she would be limited to the information in the autopsy report. This strategy did not work, because Dr. Lewis also testified regarding the time it would take to strangle the victim. Trial counsel objected to the testimony regarding the crushed larynx and strangulation, but the trial court allowed the evidence to be presented to the jury. Dr. Lewis acknowledged that the victim's wounds could have been offensive. Trial counsel agreed that Dr. Lewis's testimony would have been admitted whether or not he had entered into the agreed order.

Trial counsel did not object to the family photographs of the victim because he believed that they would be admitted over his objection and because there could be a tactical disadvantage to making the objection in front of the jury. He testified that while the autopsy photographs were graphic, they were not gory and that the jury had no reaction to them. He testified that he reviewed all the autopsy photographs and that their admissibility was determined in a jury-out hearing. Trial counsel objected to a photograph of the victim's excised larynx, and the trial court determined that the photograph would have to be reproduced in black and white instead of color. Trial counsel stated that he chose not to object to the crime scene photos because he felt that they supported the Petitioner's assertion that the victim attacked him with a pencil.

Trial counsel knew that funding was available for a forensic pathologist if he had chosen to hire one. He testified that he did not believe that a forensic pathologist was necessary because the Petitioner acknowledged having killed the victim by strangulation. Instead, the defense strategy was to assert that the Petitioner strangled the victim in self-defense after she had grown confused and attacked him. He did not think that another pathologist would have disagreed with Dr. Lewis regarding the cause of death but acknowledged that expert testimony that the victim's wounds were received during mutual combat would have been helpful.

Agent Craig testified that he did not record the interview with the Petitioner during which the Petitioner made a statement to law enforcement acknowledging that he killed the victim. Instead, Agent Craig conducted the interview, summarized the Petitioner's statements in written form, and allowed the Petitioner to review and sign the summary. Agent Craig acknowledged that he "probably" did not ask the Petitioner about taking medication. He was aware that the Petitioner would have been awake for the period of time between the homicide and his arrest. However,

10

he stated he saw no cause for concern and that it was his policy to make an individual determination regarding whether to stop an interview based on the suspect's mental state. According to Agent Craig, the interview lasted a little over an hour, and the Petitioner was "locked in," "focused," and able to answer questions. Agent Craig stated, "I don't recall anything that would lead me to believe that he was unable to follow through with [the interview]." The Petitioner reviewed the statement and made no substantive changes. Agent Craig stated that nothing during the interview, including the Petitioner's potential fatigue, raised any questions regarding his competency. The Petitioner told Agent Craig that there were no issues with his treatment at the jail. Agent Craig acknowledged that someone suffering from mental illness would not necessarily recognize it or be able to communicate it during an interview. He stated that in the past, he had "probably" chosen to continue some interviews where there were concerns of competency but had also forgone continuing others.

The post-conviction court denied relief, finding that the Petitioner had failed to establish deficiency or prejudice with regard to each claim. The post-conviction court made a finding that it credited the testimony of trial counsel and Agent Craig, that the evidence against the Petitioner was "overwhelming," and that the Petitioner had received effective assistance of counsel.

*Bettis v. State*, 2018 WL 3342830, at *3–5.

### III. CLAIMS PRESENTED FOR REVIEW

The pro se petition in this court asserts the following claims:

(1)  The evidence at trial was insufficient to support the petitioner's conviction for premeditated, first-degree murder.

(2)  The decision to allow Dr. Lewis's testimony that the specific cause of death was strangulation lasting a certain number of minutes violated the petitioner's due process rights, since that testimony was outside the content of the autopsy report, and his agreement to Dr. Lewis's substitution as a testifying expert in place of Dr. Deering was conditioned on adherence to the written report.

(3) Trial counsel provided ineffective assistance by failing to:

    (a) Order an evaluation of the petitioner's competency prior to trial;

    (b) File a motion to suppress the petitioner's statement to law enforcement;

    (c) File a motion to suppress the victim's family photographs, photographs of the victim's body at the crime scene, and photographs taken during the autopsy.

11

(Doc. No. 1 at 5–14.)

## IV. LEGAL STANDARD

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. at 410).

12

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting Section 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that

13

the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner bears the burden of proof. *Pinholster*, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182; *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). This rule has been interpreted by the Supreme Court as one of total exhaustion, *Rose v. Lundy*, 455 U.S. 509 (1982), meaning that each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to

all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977*); see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim or state law deems the claim waived),[2] then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir.

---

[2] The Tennessee Post-Conviction Procedure Act provides that "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment," and establishes a one-year statute of limitations for filing that one petition. Tenn. Code Ann. § 40-30-102(a) and (c). The Act further provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," unless that ground could not be presented due to unconstitutional state action, or is based on a new and retroactive constitutional right that was not recognized at the time of trial. *Id.* § 40-30-106(g).

15

1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## V. ANALYSIS

### A. Sufficiency of the Evidence

The petitioner's first claim is a challenge to the sufficiency of the evidence supporting his first-degree murder conviction. Specifically, he argues that the evidence shows that the victim's

16

death was not premeditated but accidental, that he "was in a very excited state of mind, trying to stop the attack" by the victim, and that "[n]othing about the killing suggests that this was anything other than manslaughter or second degree murder." (Doc. No. 1 at 7.) The petitioner exhausted this claim by raising it before the TCCA on direct appeal.

The TCCA properly stated the applicable standard as "whether, after reviewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Bettis*, 2013 WL 5436702, at *10 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In accord with this standard, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, 565 U.S. 1, 6 (2011) (quoting *Jackson*, 443 U.S. at 326)). Thus, a federal habeas court must resist substituting its own opinion for that of the convicting jury, *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988), particularly when it comes to matters of witness credibility, which "is an issue to be left solely within the province of the jury." *Knighton v. Mills*, No. 3:07-cv-2, 2011 WL 3843696, at *6 (E.D. Tenn. Aug. 29, 2011) (citing, *e.g.*, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992)).

In addition to this requirement of deference to the jury verdict concerning the substantive elements of the crime under state law, this court must defer to the TCCA's consideration of that verdict under AEDPA. *See Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (stating that "the law commands deference at two levels" when adjudicating sufficiency-of-the-evidence claim). Here, the TCCA gave the following description of the statutory elements the jury had to consider:

> First degree premeditated murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39–13–202(a)(1). A person "acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." Tenn. Code Ann. § 39–11–302(a). Premeditation

involves "an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39–13–202(d). "It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id.* "Premeditation may be proved by circumstantial evidence." *State v. Brooks*, 249 S.W.3d 323, 329 (Tenn. 2008). "Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment.'" *State v. Leach*, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting Tenn. Code Ann. § 39–13–202(d)). A defendant's use of a deadly weapon against an unarmed victim, a lack of provocation on the part of the victim, a defendant's failure to provide aid or assistance to the victim, and a defendant's calmness soon after the killing are all established factors from which a jury may infer premeditation. *See Brooks*, 249 S.W.3d at 329; *Leach*, 148 S.W.3d at 53–54. Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39–13–210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39–11–106(a)(20).

The trial court instructed the jury on self-defense. Our Code provides that the use of force likely to cause death or serious bodily injury may be justified when a person (1) "has a reasonable belief that there is an imminent danger of death or serious bodily injury"; (2) "[t]he danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time"; and (3) "[t]he belief of danger is founded upon reasonable grounds." Tenn. Code Ann. § 39–11–611(b)(2). Self-defense is a fact question for the jury. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001).

*State v. Bettis*, 2013 WL 5436702, at *11. The TCCA then considered the sufficiency of the proof

of those elements in the petitioner's case, as follows:

Taken in the light most favorable to the State, the evidence shows that the appellant went to the victim's home to talk with her about paying only a portion of his rent. The victim became angry with the appellant, they argued, and an altercation ensued. During the altercation, the appellant, who weighed over two hundred pounds, hit the victim, who weighed one hundred eight pounds, in the head several times with an ashtray and "tased" her. He then strangled the victim. Dr. Lewis testified that the appellant had to strangle the victim for at least thirty seconds in order to render her unconscious and that he had to strangle her for two to four minutes in order to kill her. Although the appellant claimed that the victim attacked him with a pencil, the victim's autopsy report shows that she may have been stabbed with the pencil. The appellant was not injured during their altercation, and he did not render aid to the victim. Instead, he drove the victim's car to the Comfort Inn and spent the night.

18

At some point, the appellant changed his clothes at his trailer and altered the crime scene. He drove the victim's car to the Pilot truck stop, called a taxi, hired Michael Adams to drive him to Nashville, and boarded a bus to Shreveport. Based upon the evidence, the jury could have found that the appellant killed the victim intentionally and with premeditation. Because the evidence is sufficient to show that the appellant acted intentionally, the evidence also is sufficient to show that he acted knowingly. *See* Tenn. Code Ann. § 39–11–301(a)(2) ("When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally."). It was within the jury's province to reject the appellant's theory of self-defense. Thus, the evidence is sufficient to support the appellant's murder convictions.

*Id.*

This court has reviewed the transcript of the petitioner's trial and finds that the TCCA's decision is supported in the record. There is ample evidence from which a rational juror could find that the petitioner intentionally killed the victim, not least of which is the sheer amount of force he used against a person half his bodyweight—including repeated blows to the victim's head with an ashtray, use of a taser, and a prolonged stranglehold—and the arrangements he made earlier on the day of the killing to buy additional luggage and withdraw a sizable amount of cash. Furthermore, as the TCCA noted, "[a]lthough the [petitioner] claimed that the victim attacked him with a pencil, the victim's autopsy report shows that she may have been stabbed with the pencil"; plus, [t]he [petitioner] was not injured during their altercation, and he did not render aid to the victim." *Id.*

The petitioner argues that the evidence of first-degree murder is insufficient by relying on the portions of Agent Craig's testimony that support the petitioner's theory that, in the absence of compelling evidence that he planned to kill the victim *before* arriving at her residence on April 1, 2011, his actions during their altercation must be construed as an overzealous attempt to force the victim into submission which resulted in her accidental death, rather than an intentional decision to kill her. (Doc. No. 1 at 6–7.) But, as noted above, it is the sole province of the jury to weigh the credibility of witnesses and to draw inferences from whatever testimony (or portion thereof) it

19

chooses to credit. *See Moreland v. Bradshaw*, 699 F.3d 908, 920 (6th Cir. 2012) (citing *United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994)); *Tenpenny v. United States*, 285 F.2d 213, 214 (6th Cir. 1960) (recognizing that criminal jury could disbelieve exculpatory portion of witness's testimony and credit inculpatory portion) (citing, *e.g.*, *Norfolk & Western Ry. Co. v. McKenzie*, 116 F.2d 632, 635 (6th Cir. 1941)). Accordingly, although Agent Craig concluded that certain evidence did not support a prior plan to kill the victim (the petitioner had not had issues with the victim in the past and bought new luggage to pursue a preexisting plan to move away from Dickson), the jury was free to draw a different inference from other evidence (such as the luggage purchase and cash withdrawal coinciding with the victim's death, Agent Craig's testimony that the crime scene had been altered, and Edward Maples's testimony to the petitioner's words and actions the morning after the killing). *See Norfolk & Western Ry. Co.*, 116 F.2d at 635 (explaining that, "once a witness is determined by the judge to be qualified to speak, the weight and credibility of every portion of his testimony is for the jury," which "alone is charged with forming a conclusion as to the truth of the testimony offered"). As the TCCA found, "[b]ased upon the evidence, the jury could have found that the [petitioner] killed the victim intentionally and with premeditation," without any justifiable need to use lethal force in self-defense. *State v. Bettis*, 2013 WL 5436702, at *11.

Even if this court disagreed with the TCCA's finding, the court may not rely on its own opinion of the weight due the testimonial and other evidence but must defer to the jury's resolution of evidentiary conflicts. *Moreland*, 699 F.3d at 920 (quoting *Jackson*, 443 U.S. at 326). Notably, "the prosecution is not under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Id.* at 921 (citing *Jackson*, *supra*). In other words, the State did not have to establish the *impossibility* of the defense theory in order to prove beyond a reasonable

20

doubt that the petitioner was guilty of an intentional and premeditated killing that was not carried out in self-defense. The evidence was sufficient for a rational juror to find that the State carried its burden, and the TCCA reasonably determined this issue with due deference to the jury's province to resolve evidentiary conflicts. The petitioner's claim to the contrary is without merit.

      B. Due Process/Scope of Expert Testimony

      The petitioner's second claim is that the trial court violated his due process rights by allowing Dr. Lewis to testify that the specific cause of death was strangulation lasting a certain number of minutes. Specifically, the petitioner argues that this testimony was outside the content of the autopsy report, and his agreement to Dr. Lewis's substitution as a testifying expert in place of Dr. Deering was conditioned on adherence to the written report. (Doc. No. 1 at 8–9.) He claims that he was deprived of notice that Dr. Lewis "would be allowed to testify as to how strangulation was the specific cause of death and how long strangulation would take to bring about death"; that this lack of notice deprived him of the opportunity to seek his own expert on the issue of strangulation; and that Dr. Lewis's testimony "about the cause of death being one single cause as opposed to a variety of causes combined, as suggested from the autopsy report," therefore violated his Fourteenth Amendment right to due process. (*Id.* at 9.)

      On direct appeal, the petitioner claimed error in the trial court's decision to allow such testimony from Dr. Lewis (*see* Doc. No. 10-9 at 8, 14–16), calling it "fundamentally unfair and a denial of Due Process" in addition to a violation of the notice requirement of Tennessee Rule of Criminal Procedure 16(c) (*id.* at 15). However, as the State points out, he did not present the claim as one implicating his federal constitutional rights.

      Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the state the "opportunity to pass upon and

correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)) (internal quotation marks omitted). To provide the state with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court, thereby alerting that court to the federal nature of the claim. *Id.* at 365–66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A claim is "fairly presented" where the petitioner "asserted both the factual and legal basis for his claim to the state courts." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citation omitted). There are four ways a petitioner can "fairly present" his federal constitutional claim to the state courts:

> (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*Id.* (citation omitted).

Although the petitioner used the words "fundamentally unfair" and "Due Process" on direct appeal, it is clear that he did not satisfy any of the methods outlined above for "fairly presenting" a federal constitutional claim to the state court. He did not rely upon federal or state cases employing federal constitutional analysis, but cited only the state procedural rule requiring prompt disclosure of additional autopsy results discovered before or during trial; he did not phrase the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; and he did not allege facts within the mainstream of constitutional law. *See McMeans*, 228 F.3d at 681 ("General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated."). The petitioner cannot now remedy his failure to present this claim to the Tennessee state courts, because Tennessee law does not allow prisoners to raise for the first time on collateral review a claim that

22

could have been brought on direct appeal, and because the statute of limitations for raising any such claims in the Tennessee state courts has long-since run. Tenn. Code Ann. § 40-30-102(c) and (g).

Accordingly, the petitioner's federal due process claim based on the allowance of testimony from Dr. Lewis that went beyond the opinions expressed in Dr. Deering's autopsy report is "technically exhausted, yet procedurally defaulted." *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015). The petitioner has not demonstrated cause for the procedural default and actual prejudice resulting from the alleged constitutional error, or that failure to consider the claim will result in a "fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), as is required in order to obtain consideration of a defaulted claim. The claim is thus not properly before this court for review.

Alternatively, even if the court could consider this claim, the petitioner's argument that the TCCA's decision violated his Fourteenth Amendment due process rights and was based on an unreasonable determination of the facts in light of the evidence presented at trial (Doc. No. 1 at 9) has no merit. After noting that the decision on whether to allow expert testimony lies firmly within the discretion of the trial court, the TCCA determined as follows:

> Dr. Deering's report states that a forensic neck dissection revealed "hemorrhages around the left posterior larynx and there was a fracture of the superior cornu of the larynx." The report also states that "the best cause of death is multiple modality trauma. The neck injuries may have been caused by strangulation. The manner of death is homicide." Thus, the appellant was aware that strangulation was going to be an issue at trial. The appellant agreed that Dr. Lewis could testify about the autopsy report in the event of Dr. Deering's absence, and Dr. Lewis testified at trial, without any objection from the appellant, as an expert in forensic pathology. Therefore, we cannot conclude that the trial court abused its discretion by allowing Dr. Lewis to testify about strangulation as the victim's specific cause of death or about the amount of time required for the appellant to have strangled the victim to death.

*State v. Bettis*, 2013 WL 5436702, at *13. Generally, "state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Wilson v. Sheldon*, 874 F.3d 470, 475–76 (6th Cir. 2017) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). "To show a due process violation under AEDPA rooted in an evidentiary ruling," the Sixth Circuit "has typically required a Supreme Court case establishing a due process right with regard to that specific kind of evidence." *Moreland*, 699 F.3d at 923 (citations omitted). The petitioner has not identified any fundamental principle of justice or Supreme Court decision that was flouted in the state courts' handling of the expert testimony and reporting on the victim's injuries and cause of death, nor is one apparent to the court.[3] Nor has the petitioner identified any factual determination (such as the TCCA's finding that he "was aware that strangulation was going to be an issue at trial" based on the content of Dr. Deering's report) that could be found unreasonable in light of his admission to authorities that he "choked [the victim] until she stopped fighting." *State v. Bettis*, 2013 WL 5436702, at *2, 4; (Doc. No. 10-3 at 59; Doc. No. 10-7 at 116–19.) The petitioner would therefore not be entitled to relief on this claim even if it were properly exhausted.

C. Ineffective Assistance of Counsel

The petitioner's third claim is that he received the ineffective assistance of counsel, in violation of his Sixth and Fourteenth Amendment rights, when trial counsel failed: to order an evaluation of the petitioner's competence prior to trial (claim 3(a)); to file a motion to suppress the petitioner's statement to law enforcement (claim 3(b)); and to file a motion to suppress the victim's family photographs, photographs of the victim's body at the crime scene, and photographs taken

---

[3] Notably, the petitioner explicitly waived "any and all objections to Dr. Deering's absence, including any confrontation issue created by [his] absence," in his pretrial agreement to Dr. Lewis's substitution for Dr. Deering. (Doc. No. 10-1 at 72–73.)

during the autopsy (claim 3(c)). All ineffective-assistance claims except the third part of claim 3(c) were properly exhausted before the TCCA.

Federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688–89. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

As discussed above, however, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, or that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. §§ 2254(d)(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of

25

ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted). The TCCA correctly identified and summarized the *Strickland* standard applicable to the petitioner's claims of ineffective assistance. *Bettis v. State*, 2018 WL 3342830, at *6. Accordingly, the critical question is whether the state court applied *Strickland* reasonably in reaching its conclusions on each ground raised by the petitioner.

### 1. Claim 3(a) — Competency

The petitioner claims that counsel, knowing that the petitioner experienced symptoms of cognitive decline significant enough to mention in his opening statement, should have obtained a mental evaluation to determine the petitioner's competency prior to trial. (Doc. No. 1 at 11.) He argues that "[w]hile a competency evaluation was performed and submitted as part of the post-conviction evidentiary hearings, where the Petitioner was found competent, it is possible that he was not competent at the point of his trial several years earlier." (*Id.*) The TCCA concluded that this claim had no merit, as follows:

> At the post-conviction hearing, the Petitioner questioned trial counsel about his opening statement, where trial counsel noted that the Petitioner had some of the "same symptoms" of dementia that the victim had. Trial counsel acknowledged that Mr. Maples testified that the Petitioner had "Alzheimer's real bad, just like our

26

mother had" but noted that Mr. Maples was not a credible witness. The Petitioner's other brothers, Mr. Delbert Bettis and Mr. Pugh, testified that the Petitioner would "zone out," but they did not testify that he had any significant mental health problems. Mr. Delbert Bettis testified that the Petitioner did not have any trouble remembering names.

At the post-conviction hearing, both trial counsel and Agent Craig testified that the Petitioner did not appear to have any mental impairment, and the trial court credited their testimony. Trial counsel testified that the Petitioner was "helpful" during trial and that "he clearly understood everything that was going on." While trial counsel emphasized evidence regarding the Petitioner's age and mental or physical health in an effort to reduce culpability, he stated that he did not have any reason to doubt the Petitioner's competency. Furthermore, Dr. Garrison, who found the Petitioner competent at the time of the hearing, testified that he could make no retroactive determination of the Petitioner's competency at the time of trial. Because the post-conviction court credited trial counsel's testimony that he had no reason to doubt the Petitioner's competency, the Petitioner has not shown deficiency. Neither has he demonstrated that, but for the failure to have him evaluated, he would have been found incompetent and would not have had to stand trial.

*Bettis v. State*, 2018 WL 3342830, at *7.

The TCCA reasonably applied the *Strickland* standard in concluding that the record before it supported the post-conviction trial court's finding (Doc. No. 10-21 at 85) that counsel was not deficient in failing to have the petitioner evaluated and the petitioner was not prejudiced by that failure. This record included (1) trial counsel's testimony that, notwithstanding his presentation to the jury in opening statements, the petitioner did not display any behavior prior to or during trial that raised a question as to his competence, (2) Agent Craig's testimony confirming that the petitioner appeared competent in his interview, and (3) the fact that the petitioner was evaluated and found to be competent during post-conviction proceedings, with no countervailing evidence aside from the petitioner's testimony that he believed he was incompetent. Under AEDPA, this ends the inquiry. Accordingly, habeas relief is not warranted based on counsel's failure to obtain a competency evaluation prior to trial.

## 2. Claim 3(b) — Statement to Law Enforcement

The petitioner claims that counsel performed deficiently in failing to seek the suppression of the statement the petitioner gave to Agent Craig and Chief Johnson, in which he confessed to killing the victim. He asserts that, had counsel sought suppression of the statement, it might have been excluded as unreliable because "the facts in his case support that his statement was made at a time when he had been awake for many days" and "was not mentally alert." (Doc. No. 1 at 11.) He suggests that counsel should have filed this suppression motion even if he did not believe there were grounds supporting the motion, because his statement was the strongest evidence against him. (*Id.* at 11–12.) The TCCA rejected these arguments, reaching the following conclusions:

> Here, the post-conviction court credited trial counsel's testimony that the Petitioner did not inform him that the Petitioner had been awake for several days prior to making the statement. Accordingly, the Petitioner has not shown deficiency. To demonstrate prejudice, the petitioner must show a reasonable probability that the motion would have been granted and that the outcome of the proceeding would thereby have been altered. *See Jason Lee Holley v. State*, No. M2017-00510-CCA-R3-PC, 2017 WL 5197295, at *5 (Tenn. Crim. App. Nov. 9, 2017), *perm. app. denied* (Tenn. Feb. 14, 2018). At the post-conviction hearing, the Petitioner essentially testified that he was affected by sleep deprivation and that his statement was not voluntary. Agent Craig, on the other hand, testified that the Petitioner did not appear excessively sleepy and that he was "locked in," "focused," and able to answer questions. Agent Craig stated, "I don't recall anything that would lead me to believe that he was unable to follow through with [the interview]." The interview lasted a little over one hour. While lack of sleep may affect the voluntariness of a statement, *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013), the post-conviction court here credited the statements of Agent Craig over those of the Petitioner. Agent Craig testified that the Petitioner did not appear to be affected by lack of sleep. Although the Petitioner asserts that the interview was unreliable because it was not recorded, Agent Craig was not required to record the interview. *See State v. Godsey*, 60 S.W.3d 759, 771 (Tenn. 2001). Accordingly, the Petitioner has not demonstrated a reasonable probability that the motion would have succeeded. Given the nature of the physical evidence implicating the Petitioner, neither has he shown a reasonable probability that the success of the motion would have changed the outcome of the trial. He is not entitled to relief.

*Bettis v. State*, 2018 WL 3342830, at *7.

The TCCA reasonably concluded that, while lack of sleep may impact the voluntariness of a confession in certain circumstances, the post-conviction testimony in the petitioner's case established that counsel was not aware of such grounds for suppressing the petitioner's statement, and that Agent Craig did not observe any effects of sleep deprivation during the interview that produced the petitioner's statement. The only evidence supporting the petitioner's contrary claim that counsel was aware of grounds for suppression was his own post-conviction testimony, which the trial court did not credit. Under these circumstances, the TCCA appropriately deferred to the post-conviction trial court's credibility finding, noting that the petitioner had not made the evidentiary showing required to upset that finding and therefore failed to demonstrate deficient performance. This court must also defer to that credibility determination, as the record does not reveal it to be "clearly erroneous." *Al-Khafajy v. Dist. Dir., ICE New Orleans Field Off.*, No. 3:19-cv-00248, 2020 WL 5748877, at *8 (M.D. Tenn. Sept. 25, 2020) (quoting *Howell v. Hodge*, 710 F.3d 381, 386 (6th Cir. 2013)) (finding that TCCA reasonably rejected claim that plea was involuntary, where petitioner "'merely refer[red] to his own testimony' at the evidentiary hearing, which the state court found to be less credible than counsel's contrary testimony").

The TCCA also reasonably found that the petitioner failed to show prejudice from any deficient failure of counsel to seek suppression of his statement, as he did not establish any reason to believe that a motion to suppress would have succeeded if filed, or that the outcome of the trial would have changed if the statement had been suppressed, given the strength of the physical evidence against the petitioner—which included the victim's hair and blood on his clothes and his DNA underneath the victim's fingernails.

In sum, the petitioner has not shown that the TCCA unreasonably applied *Strickland* in concluding that counsel was not ineffective in failing to seek suppression of his statement. He is thus not entitled to habeas relief on these grounds.

### 3. Claim 3(c) — Photographs

The petitioner claims that trial counsel was ineffective in failing to file a motion to suppress the victim's family photographs, photographs of the victim's body at the crime scene, and photographs taken during the autopsy. The petitioner argues that all three sets of photographs were subject to exclusion from evidence because of their propensity to arouse the jury's sympathies (in the case of the family photographs) or otherwise to unfairly prejudice his defense due to their graphic nature. The State asserts that the claims regarding the family and crime-scene photographs were properly exhausted in state court, but that the claim regarding autopsy photographs was procedurally defaulted when the petitioner failed to introduce those photographs into the appellate record.

### a. Defaulted Sub-Claim

"[A] petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (citations omitted). "To be adequate, a state procedural rule must be firmly established and regularly followed" as of the time that the petitioner failed to comply with its requirements. *Fautenberry v. Mitchell*, 515 F.3d 614, 640–41 (6th Cir. 2008) (citations omitted). "Once the [federal habeas] court determines that a state procedural rule was not complied with and that the rule was an

adequate and independent state ground, then the petitioner must demonstrate under [*Wainwright v. Sykes*, 433 U.S. 72 (1977)] that there was 'cause' for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Here, in addressing the petitioner's claim related to autopsy photographs, the TCCA first reviewed the relevant authority and stated that "[p]hotographs of a victim's body are generally admissible if relevant to the issues at trial, notwithstanding the fact that they may be gruesome or horrifying." *Bettis v. State*, 2018 WL 3342830, at *9 (collecting cases). The appellate court then surmised that such graphic photographs would be relevant in the petitioner's case because he "was charged with first degree premeditated murder, and photographs of the victim's corpse would have demonstrated the amount of trauma she suffered prior to her death, including that the Petitioner administered repeated blows." *Id.* But the TCCA could not proceed to determine the merits of this claim because, while a black-and-white photograph of the victim's larynx was contained in the appellate record, the remaining autopsy photographs were absent from the record of proceedings on appeal, even though they "were available at the post-conviction hearing." *Id.* Because the petitioner—who, as the appellant, "bears the burden of providing a record adequate to support review of the issues raised"—"failed to append the photographs, specify which photographs were inadmissible, or specify what the grounds for excluding them would be," the TCCA concluded that he waived the ineffective-assistance claim related to autopsy photographs. *Id.* at *9 (citing Tenn. R. App. P. 24(b); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000) (determining that the failure to prepare a proper record results in waiver)).

A review of the transcript of state-court proceedings filed in this habeas case reveals that the autopsy photographs, shown to the jury and made part of the trial record as "Collective Exhibit

38," were kept in a binder "on file in the Clerk's Office" (Doc. No. 10-7 at 3) and, as recognized by the TCCA, were utilized during the petitioner's post-conviction evidentiary hearing to aid the direct examination of trial counsel. (Doc. No. 10-22 at 51.) But post-conviction counsel did not include them in the record on appeal to the TCCA. As the Sixth Circuit has noted:

> Under Tennessee law, "[w]hen an accused seeks appellate review of an issue . . . it is the duty of the accused to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues which form the basis of the appeal." *State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999) (citing Tenn. R. App. P. 24(b); *State v. Bennett*, 798 S.W.2d 783 (Tenn. Crim. App. 1990)). In interpreting this section, Tennessee courts have stated that:
>
>> [a]llegations contained in pleadings and statements made by counsel during a hearing or the trial are not evidence. Thus, neither can be considered in lieu of a verbatim transcript or statement of the evidence and proceedings. The same is true with regard to the recitation of facts and argument contained in a brief submitted to this Court and statements made by counsel during oral argument.
>
> *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990).

*Ray v. Holland*, 230 F.3d 1359 (Table), 2000 WL 1290219, at *5 (6th Cir. Sept. 5, 2000).

Because the state procedural rule applied by the TCCA, Tennessee Rule of Appellate Procedure 24(b), "is regularly and consistently applied by the Tennessee courts," failure to comply with its requirement to prepare a proper record "is an adequate and independent state ground to support a finding of procedural default." *Id.* (citing Tennessee cases). The question thus becomes whether the petitioner's default may be excused, as "[f]ederal courts will not [otherwise] consider the merits of procedurally defaulted claims." *Williams*, 460 F.3d at 805. The petitioner has not attempted to show cause for his failure to comply with the state procedural rule relied upon by the TCCA.

Moreover, even if this default could be excused, the petitioner has offered no reason to believe that trial counsel's failure to seek suppression of the autopsy photographs constituted

ineffective assistance. He contends that gruesome photographs were used "to persuade the jury toward a First Degree Murder verdict rather than a less[e]r included charge" that the jury might have convicted him of, if drawings and diagrams were the only depictions of the victim's injuries that had been introduced. (Doc. No. 1 at 13.) However, "the issue is not whether the evidence is prejudicial, but whether it is *unfairly prejudicial*." *State v. Davidson*, 509 S.W.3d 156, 199 (Tenn. 2016) (emphasis in original). The petitioner appears to believe that the baseline gruesomeness of autopsy photographs "to people who do not have to deal with seeing dead people or seeing photographs of dead people" is such that an effective defense attorney would automatically seek to keep the jury from seeing them. (Doc. No. 1 at 13.) But the Tennessee Supreme Court has explained that such photographs which are "not cumulative," which "assist[ ] in the jury's understanding of the medical examiner's testimony," and which are "graphic but not unnecessarily gruesome or horrifying especially given the facts" are not unfairly prejudicial. *Davidson*, 509 S.W.3d at 200–01.

As the TCCA noted, the petitioner's counsel "sought to exclude and succeeded in having admitted in black-and-white format" the one autopsy photograph he regarded as particularly gory, that of the victim's excised larynx. *Bettis v. State*, 2018 WL 3342830, at *9. During the trial, with the jury out, counsel objected that the injury to the victim's larynx "can be testified to without showing a bloody piece of the body coming out of the victim and laid on a piece of cloth for a picture." (Doc. No. 10-4 at 41.) He stated that photographs of the victim's "multiple wounds, including wounds to the head, where the head was impacted by the ashtray," were "pretty rough looking" and "show[ed] the scalp and puncture wounds from that object," but that he did not object to those because of the necessity "to demonstrate that the object matches the wounds, as opposed to a hammer or anything else." (*Id.*) The trial court overruled counsel's objection to the larynx

photograph, stating that it was a "clean" autopsy photograph and that the "[p]robative value to the pictures, I think, is high." (*Id.* at 46.) Nonetheless, counsel prevailed upon the court to require the State to attempt to render the larynx photograph in black-and-white before its publication to the jury, which the State did. (*Id.* at 46–48.) Particularly in light of the nature of the victim's injuries, the absence of any indication that photographs of those injuries were excessively gory, and the strength of the other evidence against him, the petitioner has failed to demonstrate that counsel performed deficiently in failing to move to suppress the remaining autopsy photographs, or that he was prejudiced by that failure. Accordingly, even if the default of this claim could be excused, habeas relief would not be warranted on this record.

### b. Properly Exhausted Sub-Claims

The petitioner's remaining ineffective-assistance claims were properly exhausted before the state courts, which denied them on their merits under *Strickland*. The TCCA found that, even if counsel had performed deficiently in failing to seek exclusion of the victim's family photographs, the petitioner "made no showing of prejudice":

> The Petitioner was linked to the murder of the victim by his own statement to police and by strong physical evidence. There is not a reasonable probability that the jury would have acquitted him had trial counsel managed to exclude the three pictures of the victim with her family. *See State v. Adams*, 405 S.W.3d 641, 658 (Tenn. 2013) ("Generally, photographs taken during the life of a victim are not so prejudicial as to warrant a new trial."); *Young*, 196 S.W.3d at 106 (holding that error admitting photograph was harmless); *Cole*, 155 S.W.3d at 912 (concluding that any error in admitting photograph was harmless). The photographs were not inflammatory or calculated to unduly rouse the jury's passions. The Petitioner is not entitled to relief.

*Bettis v. State*, 2018 WL 3342830, at *8.

The TCCA reasonably applied *Strickland*'s prejudice standard, 466 U.S. at 694, in concluding from the record before it that the result of the proceeding would not have been different if counsel had sought and won suppression of the three family photographs. Given the strong

evidence against the petitioner, the admission of those photographs without objection cannot be said to have "render[ed] the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart*, 506 U.S. at 372.

As to the crime-scene photographs, the TCCA determined that neither deficient performance nor prejudice could be established:

> Trial counsel testified that he did not move to exclude the photographs because he believed that they would be helpful to the defense. The post-conviction court credited trial counsel's testimony that he felt the photographs depicting the victim would support the Petitioner's theory of the case.
>
> The Petitioner had given a statement acknowledging that he killed the 108-pound victim but asserting that he was attempting to defend himself against her pencil attack. The crime scene photographs showed the deceased victim lying with a pencil below the crook of her elbow, lending some credence to an otherwise implausible claim. Because the decision not to challenge the photographs was a sound strategic decision, the Petitioner cannot show that his counsel's actions were deficient. Furthermore, these photographs were relevant to the issues at trial, "because they accurately depict the nature and circumstances of the crimes." *State v. Carter*, 114 S.W.3d 895, 903 (Tenn. 2003) (concluding there was no error in admitting photographs of the deceased victims at the crime scene during capital sentencing); *see State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993) (finding no error in admission of photographs depicting deceased victims at the crime scene). Accordingly, the Petitioner has also not demonstrated prejudice.

*Id.* at *9.

The TCCA reasonably determined that the record before it was insufficient to overcome the presumption that counsel's decision was sound trial strategy. A decision made by counsel in pursuance of an objectively reasonable trial strategy cannot be the basis for a claim of ineffective assistance; such decisions are only assailable if "counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Miller v. Francis*, 269 F.3d 609, 615–16 (6th Cir. 2001) (quoting *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)). That high bar was obviously not cleared in this case based on counsel's decision not to challenge the crime-scene photographs.

In sum, the petitioner is not entitled to habeas relief on any of his claims of ineffective assistance of counsel.

## VI. CONCLUSION

For all these reasons, the habeas corpus petition will be denied and this matter will be dismissed with prejudice.

The court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. *Id.* at 337.

Because reasonable jurists could not debate whether the petitioner's claims should have been resolved differently or deserve encouragement to proceed further, the court will deny a COA. The petitioner may seek a COA directly from the Sixth Circuit Court of Appeals, Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order is filed herewith.

Aleta A. Trauger
United States District Judge